[Cite as *State v. Wright*, 2017-Ohio-1568.]

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

STATE OF OHIO,                          :          APPEAL NO. C-150715
                                                   TRIAL NO. B-1107860B
    Plaintiff-Appellee,             :
                                                   *O P I N I O N.*
  vs.                                   :

GIOVANNI WRIGHT,                        :

    Defendant-Appellant.            :


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  April 28, 2017


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*The Farrish Law Firm* and *Michaela M. Stagnaro*, for Defendant-Appellant.

**MOCK, Presiding Judge.**

{¶1} Defendant-appellant Giovanni Wright was indicted on one count of aggravated murder under R.C. 2903.01(A), with accompanying specifications. His first trial resulted in a hung jury. The case was retried, and the jury found Wright guilty as charged. He was sentenced to life in prison without parole, plus three years' imprisonment on one of the specifications. He now appeals that conviction. We find no merit in his eight assignments of error, and we affirm his conviction.

### I. Factual Background

{¶2} The record shows that on March 28, 2010, at approximately 12:15 a.m., police officers were dispatched to 506 East 12th Street in the Pendleton area of Cincinnati. At that time, Pendleton was a high-crime area, with a lot of drug trafficking and violence.

{¶3} Cincinnati police officer Richard Longworth arrived on the scene to find an SUV that had rolled back and hit another car. An excited woman came out of a doorway wanting to know if the individual in the car was still alive. Longworth opened the door, turned the vehicle off and put it in park. He found the driver, later identified as Richard Parks, slumped over inside. Longworth attempted to take the victim's pulse, and the victim's head moved slightly. Longworth saw bullet holes in his head and knew that he had died.

{¶4} The woman was Shavonne Bonner, who had once lived in the Pendleton area, which the residents referred to as "up on the hill." She had known Wright since she was a child and considered him to be "like family." At one time, she had dated Wright's friend, Calvin Bolton. Although she and Bolton had parted ways, they remained friendly.

2

{¶5}   In 2009, Bonner began dating Parks.  Bonner knew that Parks sold drugs in his west-end neighborhood.  She also knew that Wright sold drugs "up on the hill," and that generally sellers only conducted business in their own neighborhoods.

{¶6}   Late on March 27, 2010, Parks drove Bonner in a rented SUV to 12th Street where she met up with friends.  They sat on the steps outside of a house while drinking and chatting.  Parks asked if anyone knew where Wright and Bolton were, and when no one there indicated that they knew, Parks made a phone call.  Afterwards, he told Bonner that he was leaving to pick up Wright and Bolton.  A short time later, Bonner accidentally dropped her phone in her drink.  She called Parks and asked him to bring her a phone before he left.  When Parks did so, Bonner did not see anyone with him in the SUV.

{¶7}   Bonner then saw Parks drive away.  About 15 minutes later, Parks's SUV "came flying down the street" and stopped a short distance away, as if it was being parked.  Bonner could not see who was inside because the windows were tinted.  She heard a gunshot and ducked down.  When she looked up, she saw two black men get out of the SUV and run up 12th Street.

{¶8}   She then saw the brake lights come on as the SUV backed into another car.  She rushed over to the SUV and opened the driver's side door.  Parks was leaning over to the right, and she put her hand on his arm and shook him.  Blood covered her hand and her jacket.  She started screaming and called the police.

{¶9}   After police officers had secured the scene, Detective Jacob Wloszek arrived and saw Parks seated behind the steering wheel in the SUV with his hands folded in his lap.  He had gunshot wounds to the back right side of his head.  Blood spatters, brain matter, and skull fragments were found inside the vehicle.  The police

also found a plastic cup, a hat, a cell phone, two cell-phone chargers, drugs and cash inside. Wloszek stated that the presence of cash and drugs with some value inside the SUV made it less likely that robbery was the motive for the crime. Further, there was no damage to the outside of the SUV.

{¶10} Forensic pathologist Dr. Karen Looman examined the body. She determined that Parks had died from being shot four times in the back of the head. Because she did not observe any stippling around the entrance wounds, she determined that the shots were fired from an indeterminate distance, meaning at least 18 inches away. She also stated that Parks could have been shot by somebody behind him or he could have been shot while looking to the side.

{¶11} Officer Leigh Cherni photographed the evidence at the scene and lifted eight fingerprints from the outside of the SUV. When the fingerprints were compared with known fingerprints, no matches were found. Five years later, on the eve of trial, the police resubmitted the fingerprints to a more up-to-date system. It showed that four prints matched Wright's. A fingerprint expert confirmed the match. He stated that from the orientation of the prints as they were found on the SUV's exterior, they appeared to have been made when Wright was closing the rear passenger door.

{¶12} Wloszek testified that Parks had been known to sell drugs and had been a prime suspect in two other homicides. After interviewing witnesses, Wloszek learned that the last people to see Parks before the murder were Wright and Bolton. He also heard that Marquez Smith, who had grown up in the same area as Wright and Bolton, had recently been charged with a crime committed in the Pendleton area. He then contacted Smith's attorney to see if Smith had any information about Parks's murder.

4

{¶13} When Smith did not appear at the second trial, the trial court declared him to be an unavailable witness. The court then allowed the state to read his testimony from the first trial to the jury. The court also allowed the state to play to the jury a recording of Smith's statement to the police, over Wright's objection.

{¶14} Smith told police that shortly before the shooting, he had seen Parks driving a light-colored vehicle "like a little mini truck," that appeared to be rented. He stated that Wright and Bolton were in the car with Parks, and that Parks drove the car down 13th Street. After seeing them drive by, Smith walked to a store at the top of 13th Street and stood by some people he knew who were gathered there. Then he saw the SUV drive down 12th Street and pull over. Parks was still driving, and Smith believed that Wright was sitting in the back seat. Some women there heard a gunshot that Smith did not hear because music was playing. Two men dressed in black jumped out of the SUV and ran in separate directions.

{¶15} Michael Lewis had met Wright while growing up in the Pendleton neighborhood. He knew of Parks, but did not know him personally. Several days after Parks was shot, Lewis and Wright were selling drugs. Lewis stated that Wright put his arm around Lewis and said that he had to "straighten that nigga from the lot with tats on his face" because he had been trying to "take over" Wright's territory. Lewis knew that Wright was referring to Parks, and that to "straighten" him meant to kill him. Lewis did not talk to the police at that time, but gave the information when detectives contacted him months later while he was incarcerated on unrelated charges.

{¶16} Michael Douthit testified that he knew Wright from seeing him in the Pendleton neighborhood. They were not friendly, but they acknowledged each other.

Douthit also knew Bolton and Parks, and he stated that he and Parks were good friends. Douthit heard about Parks's murder from Parks's friends and family.

{¶17} Douthit stated that while he and Wright were both incarcerated in Kentucky, they had talked about Parks's murder. Wright originally denied shooting Parks. Later, Wright discussed Parks's alleged involvement in the murder of Ramone Johnson. Wright stated that after Johnson's murder, he had called Parks and told him to "come up to the hill." Then Wright said that he "got in the back of the car and shot [Parks] in the back of the head." Douthit stated that Wright killed Parks because of the "Ramone situation" and because Wright "didn't know if [Parks] was gonna get him before he got [Parks]."

### I. Batson Challenge

{¶18} In his first assignment of error, Wright contends that the trial court erred in overruling his objection to the state's use of a peremptory challenge to exclude an African-American juror from the jury panel. He argues that the state's use of that challenge without a valid race-neutral reason violated his right to equal protection. This assignment of error is not well taken.

{¶19} In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that the Equal Protection Clause of the United States Constitution precludes purposeful discrimination by the state in the exercise of preemptory challenges so as to exclude members of minority groups from petit juries. *State v. O'Neal*, 87 Ohio St.3d 402, 409, 721 N.E.2d 73 (2000); *State v. Williams*, 1st Dist. Hamilton No. C-130277, 2014-Ohio-1526, ¶ 35. *Batson* established a three-step procedure for evaluating claims of racial discrimination in the use of peremptory challenges. *State v. White*, 85 Ohio St.3d 433, 435, 709 N.E.2d 140 (1999); *Williams* at ¶ 35.

{¶20} First, the opponent of a peremptory strike must make a prima facie showing of discrimination. Second, the proponent of the strike must give a race-neutral explanation for the strike. *State v. Herring*, 94 Ohio St.3d 246, 255-56, 762 N.E.2d 940 (2002); *Williams* at ¶ 36. The state's reason is deemed to be race-neutral unless discriminatory intent is inherent in the explanation. *Williams* at ¶ 36; *State v. Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, ¶ 15. Third, the trial court must determine whether, under all the circumstances, the opponent has proven purposeful discrimination. *Herring* at 256; *Williams* at ¶ 36.

{¶21} The burden of persuasion always stays with the opponent of the strike. A reviewing court will defer to the trial court's finding that no discriminatory intent existed since it turns largely on an evaluation of credibility. *Id.* The reviewing court may only reverse a trial court's finding if that finding is "clearly erroneous*.*" *Hernandez v. New York,* 500 U.S. 352, 369, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *Williams* at ¶ 37.

{¶22} In response to Wright's objection to the state's use of the peremptory challenge, the prosecutor provided several reasons for the use of the challenge. He stated that (1) the juror had a religious background and some people "connected to her" ministered to prisoners; (2) she had a strong personality and the prosecutor was concerned that she might not listen and consider all of the evidence; (3) she was overly receptive to the defendant's point of view of the case as expressed during voir dire; (4) she stated that she would be angry "to the point it would take control over her" if someone suggested something that was not true about her; (5) the prosecutor was not satisfied with her answers when she was asked about people in jail getting case consideration; (6) she indicated that she had known a police officer and that they did not have a "good rapport"; and (7) she indicated that she was "engaged in a

profession of exactness." The prosecutor indicated that it was the "cumulative effect" of all these reasons that caused him to use the peremptory challenge.

{¶23} Thus, the prosecutor provided race-neutral reasons for the use of the challenge. The explanation need not rise to the level of justifying the exercise of a challenge for cause. *O'Neal*, 87 Ohio St.3d at 409, 721 N.E.2d 73; *Williams*, 1st Dist. Hamilton No. C-130277, 2014-Ohio-1526, at ¶ 44. The trial court's acceptance of these race-neutral reasons was not clearly erroneous. Wright has not met his burden to show discriminatory intent, and we overrule his first assignment of error.

## II. Hearsay

{¶24} In his second assignment of error, Wright contends that the trial court erred in allowing hearsay to be admitted into evidence. First, he argues that the court erred in finding Marquez Smith to be an unavailable witness and allowing the state to read his prior testimony to the jury.

{¶25} A witness is unavailable when he is absent from the proceedings and the proponent of his statements has made reasonable, good-faith efforts to secure his presence. *State v. Keairns*, 9 Ohio St.3d 228, 460 N.E.2d 245 (1984), paragraph two of the syllabus; *State v. Nix*, 1st Dist. Hamilton No. C-030696, 2004-Ohio-5502, ¶ 25-26. The burden is on the proponent to establish unavailability. A showing of unavailability must be based on the testimony of witnesses rather than hearsay not under oath unless unavailability is conceded by the party against whom the statement is being offered. *Keairns* at paragraph three of the syllabus; *Nix* at ¶ 26-27.

{¶26} In this case, the prosecutor did not present sworn testimony about its efforts to procure Smith's attendance at trial. But, the trial court stated that "based on the off-record conversation that while defense is going to object, * * * they don't

8

dispute what [the prosecutor] has said and they're not requiring him to put on any of the detectives as witnesses. It's just more a matter of objection to the testimony itself without necessarily refuting the facts." Wright's counsel did not contradict that statement, although he did not concede that Smith was unavailable.

{¶27} Wright also did not object on the basis that sworn testimony was required. In *Nix*, this court, under similar facts, overruled an assignment of error in which the defendant alleged error in the trial court's finding that a witness was unavailable. We stated, "we hold that the trial court and the prosecutor could have reasonably inferred from what Nix's attorney had said, and had not said, that a concession was made regarding the efforts made by the prosecution to locate" the witness. *Nix* at ¶ 32. We went on to state that "the foundational requirements of *Keairns* are not to be strictly applied unless made an issue by events at trial." *Id.* at ¶ 33. Under the circumstances, we hold that Wright forfeited the right to have the prosecution present sworn testimony. *See State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 21.

{¶28} As to the merits of the state's claim that Smith was unavailable for trial, the record shows that before trial Smith told police that he wanted an attorney, and the trial court appointed one for him. Smith was personally served with a subpoena. He appeared on the first day of trial. When he was not called as a witness that day, the prosecutor told him to return the next day. He was present the next day when the jury was viewing the crime scene, but left the courthouse. Police officers called Smith and sent him texts telling him to return, and he responded several times. When Smith did not appear at the time he said he would, the state asked the court to order a body attachment. The police contacted Smith's parole officer, who

unsuccessfully attempted to locate him. Police officers also went to Smith's house and his parents' house in an effort to detain him, but could not find him.

{¶29} Smith had testified at the previous trial, but he was a reluctant witness. He maintained that he did not remember anything that he had told police. Consequently, he was called as a court witness, and the court allowed the prosecutor to cross-examine him. The prosecutor stated, "I think the police would tell you that he's on the run and actively trying to avoid being brought before you for the purpose of testifying in these proceedings." Under the circumstances, we cannot hold that the trial court erred in determining that the state met its burden to show that Smith was unavailable.

{¶30} Evid.R. 804(B)(1) allows for a hearsay exception for a declarant's former testimony when the declarant is unavailable. Smith's testimony from the previous trial fell under this hearsay exception, because it came from an adversarial proceeding and Wright had the opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. *See State v. Garnett*, 1st Dist. Hamilton No. C-090471, 2010-Ohio-3303, ¶ 8-9. Consequently, the trial court did not err in allowing the state to read Smith's former testimony at trial.

{¶31} Wright next contends that Smith's unsworn statement to the police should not have been read into the record. As the state contends, the testimony fell under the hearsay exception for recorded recollection set forth in Evid.R. 803(5). Under that exception, a party must establish that (1) a witness has a lack of present recollection of the recorded matter; (2) the recorded recollection was made at a time when the matter was fresh in the witness's memory; (3) the recorded recollection was made or adopted by the witness; and (4) the recorded recollection correctly reflects the witness's prior knowledge. *State v. Davenport*, 1st Dist. Hamilton No. C-980516,

10

1999 WL 550425, *6 (July 30, 1999). If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party. *State v. Henson*, 1st Dist. Hamilton No. C-060320, 2007-Ohio-725, ¶ 17.

{¶32} At the first trial, Smith repeatedly said that he did not remember the events in question. But he acknowledged making the statement to the police and that, at the time, his knowledge was fresh. He denied lying to the police and stated that he was being as honest as he could when he talked to them. Consequently, the statement was admissible under the recorded-recollection exception to the hearsay rule. *See id.* at ¶ 13-15.

{¶33} Next, Wright argues that the state should not have been permitted to play the recording of the statement after having read it into the record. He cites no authority for this proposition. The trial court did not send the transcript of the statement or the recording to the jury, which would have been error. *See id.* at ¶ 17. Because the statement was admissible into evidence and playing it for the jury did not violate the rules of evidence, we cannot hold that the trial court erred in playing the recording for the jury.

{¶34} Wright next contends that Bonner should not have been allowed to testify as to what Parks, the victim, had said prior to the murder. She testified that Parks had asked if anyone knew where Wright and Bolton were. Parks then made a phone call, and afterwards, he told Bonner that he was going to go pick up Wright and Bolton.

{¶35} The state argues that Bonner's testimony regarding Parks's statements was admissible under Evid.R. 803(1). That rule provides a hearsay exception for an out-of-court statement "describing or explaining an event or condition made while

11

the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness."

{¶36} The record does not establish a precise context for Parks's statements. There was no evidence showing exactly to whom he was speaking, the context of his statements, or what precisely he was perceiving. In the absence of some evidence of the event or condition that prompted his statements, we cannot conclude that the statements were descriptive or explanatory. *See State v. Lackey*, 1st Dist. Hamilton No. C-890682, 1990 WL 193371, *2 (Dec. 5, 1990). Consequently, the trial court erred in admitting Bonner's testimony about Parks's statements.

{¶37} Nevertheless, viewing the evidence as a whole, we hold that the error did not affect Wright's substantial rights. Therefore, the error was harmless. *See State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15; *State v. Geary*, 1st Dist. Hamilton No. C-160195, 2016-Ohio-7001, ¶ 11.

{¶38} Next, Wright contends that Detective Wloszek should not have been allowed to testify to hearsay statements made by Michael Lewis and Michael Douthit. The state contends that their statements were admissible under Evid.R. 801(D)(1). That rule provides that a statement is not hearsay if "the declarant testifies at a trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive * * *." In determining whether to admit a prior consistent statement, a trial court should take a "generous view" of "the entire trial setting to determine if there was sufficient impeachment to amount to a charge of recent fabrication or improper influence or motivation." *State v. Jones*, 1st Dist. Hamilton No. C-080518, 2009-Ohio-4190, ¶ 35.

12

{¶39} Lewis testified that while they were in prison, Wright had told him that he had to "straighten that nigga from the lot with tats on his face," whom Lewis knew to be Parks. During cross-examination, Wright's counsel implied that Lewis lied to receive favorable treatment and that Lewis was a drug dealer with his own motive to kill Parks. Lewis's statement to the police was consistent with his trial testimony, and, under the rule, it was not hearsay. *See State v. Lukacs*, 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, ¶ 14-15 (1st Dist.).

{¶40} Similarly, Douthit testified that Wright had admitted to killing Parks because of Parks's involvement with the murder of another drug dealer from the neighborhood and because he feared Parks would come after him. On cross-examination, Wright's counsel implied Douthit had fabricated his testimony to receive favorable treatment. Consequently, the detective could testify about Douthit's prior consistent statement. Sufficient impeachment occurred to amount to a charge of recent fabrication at trial, therefore the statements were not hearsay under Evid.R. 801(D)(1)(b), and the trial court did not err in allowing the detective to testify regarding those statements. *See Lukacs* at ¶ 15; *Jones* at ¶ 36-37.

{¶41} In sum, we find no reversible error in the admission of testimony of which Wright complains. Therefore, we overrule Wright's second assignment of error.

### III. Other-Acts Evidence

{¶42} In his third assignment of error, Wright contends that the trial court erred by allowing other-acts testimony to be admitted into evidence. He argues that the state should not have been allowed to present testimony that Wright was a drug dealer and had committed other crimes, because the only purpose of this testimony was to portray him as a violent criminal. This assignment of error is not well taken.

13

{¶43} Generally, the prosecution in a criminal case may not present evidence that the defendant has committed other crimes or acts independent of the crime for which the defendant is being tried to establish that he acted in conformity with his bad character. Evid.R. 404(B); *Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, at ¶ 20. But Evid.R. 404(B) also provides that other bad acts are admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *State v. Shedrick*, 61 Ohio St.3d 331, 337, 574 N.E.2d 1065 (1991); *Thomas* at ¶ 20.

{¶44} Because Evid.R. 404(B) codifies an exception to the general rule, it must be strictly construed against admissibility. *State v. Coleman*, 45 Ohio St.3d 298, 299, 544 N.E.2d 622 (1989); *Thomas* at ¶ 21. Nevertheless, the other acts need not be similar to the crime at issue. If the other acts tend to show by substantial proof any of the items enumerated in Evid.R. 404(B), evidence of other acts is admissible. *Coleman* at 299-300; *Thomas* at ¶ 21.

{¶45} The other acts in this case were not independent of the crime but were "inextricably interwoven" with the crime charged in the indictment. *See State v. Kendrick*, 1st Dist. Hamilton No. C-080509, 2009-Ohio-3876, ¶ 24. The testimony was necessary to show the relationship between Wright, Parks, and the various witnesses, and Wright's motive for killing Parks. Consequently, the trial court did not abuse its discretion by allowing the other acts to be admitted into evidence. *See State v. Carusone*, 1st Dist. Hamilton No. C-010681, 2003-Ohio-1018, ¶ 29. We overrule Wright's third assignment of error.

### IV. Impeachment

{¶46} In his fourth assignment of error, Wright contends that the trial court erred by permitting the state to impeach its own witnesses. He contends that the

state impeached the testimony of Bonner and Smith without complying with Evid.R. 607. This assignment of error is not well taken.

{¶47} Under Evid.R. 607(A), the party calling a witness may attack that witness's credibility only upon a showing of surprise and affirmative damage. *Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, at ¶ 27. A neutral answer such as "I don't remember" does not constitute affirmative damage. *State v. Williams*, 1st Dist. Hamilton No. C-150249, 2016-Ohio-5827, ¶ 28.

{¶48} When the prosecutor asked Bonner if she had told the police who the shooter was, she initially denied it. Then the prosecutor asked her if she told the police that Wright had been the shooter, and she stated that she did not remember. The state argues that this did not constitute impeachment with a prior inconsistent statement. We disagree. Because that neutral answer did not constitute affirmative damage, those questions were inappropriate under Evid.R. 607.

{¶49} Nevertheless, Wright did not object. And we can reverse only upon a finding of plain error. *See State v. Underwood*, 3 Ohio St.2d 12, 13, 444 N.E.2d 1332 (1983); *Lukacs*, 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, at ¶ 31. We cannot hold that but for the error, the results of the proceeding would have been otherwise. Therefore, the error did not rise to the level of plain error. *State v. Wickline*, 50 Ohio St.3d 114, 119-120, 552 N.E.2d 913 (1990); *Lukacs* at ¶ 31.

{¶50} Smith also testified at the previous trial that he did not remember talking to the police. Impeachment of his testimony would not have been permissible under Evid.R. 607. But his statement was separately admissible under Evid.R. 803(5) as recorded recollection. Therefore, the trial court did not err in allowing it to be admitted into evidence, and we overrule Wright's fourth assignment of error.

### V. Prosecutorial Misconduct

{¶51} In his fifth assignment of error, Wright contends that the trial court erred in allowing the prosecutor to introduce improper evidence and commit other misconduct during the trial. He argues that the prosecutor improperly impeached witnesses, introduced improper evidence, improperly vouched for witnesses, and made improper comments during closing argument. This assignment of error is not well taken.

{¶52} Prosecutors are normally entitled to wide latitude in their remarks. *State v. Mason*, 82 Ohio St.3d 144, 162, 694 N.E.2d 932 (1998); *Lukacs*, 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, at ¶ 55. The test for prosecutorial misconduct is (1) whether the remarks were improper, and (2) if so, whether the remarks affected the accused's substantial rights. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990); *Lukacs* at ¶ 55. The conduct of the prosecuting attorney cannot be grounds for error unless it deprives the defendant of a fair trial. *State v. Keenan*, 66 Ohio St.3d 402, 405, 613 N.E.2d 203 (1993); *Lukacs* at ¶ 55.

{¶53} Most of Wright's arguments are a rehash of the arguments in his previous assignments of error, the majority of which we have already rejected. As for the comments in closing argument, Wright failed to object to many of the comments that he now claims were improper. Thus, he cannot raise these issues on appeal unless they rise to the level of plain error. *See Underwood*, 3 Ohio St.3d at 13, 444 N.E.2d 1332; *Lukacs* at ¶ 56. Our review of the record shows that even if some of the comments were improper, none were so egregious as to affect his substantial rights or to deny him a fair trial. Therefore, they did not rise to the level of plain error. *See Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 22. Consequently, we overrule Wright's fifth assignment of error.

### VI. Ineffective Assistance of Counsel

{¶54} In his sixth assignment of error, Wright contends that he was denied the effective assistance of counsel. He argues that his counsel was ineffective for failing to object to other-acts evidence, hearsay evidence, improper impeachment, and prosecutorial misconduct. This assignment of error is not well taken.

{¶55} A court will presume that a properly licensed attorney is competent, and the defendant bears the burden to show ineffective assistance of counsel. *State v. Hamblin*, 37 Ohio St.3d 153, 155-156, 524 N.E.2d 476 (1988); *State v. Hackney*, 1st Dist. Hamilton No. C-150375, 2016-Ohio-4609, ¶ 36. To sustain a claim for ineffective assistance of counsel, the defendant must demonstrate that counsel's performance was deficient, and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hackney* at ¶ 36.

{¶56} Counsel's failure to make objections is not, by itself, enough to sustain a claim for ineffective assistance of counsel. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 168; *Hackney* at ¶ 39. The record shows that Wright's attorney provided his client with a diligent and thorough defense. Wright has not demonstrated that his counsel's representation fell below an objective standard of reasonableness or that, but for counsel's unprofessional errors, the results of the proceeding would have been otherwise. Therefore, he has failed to meet his burden to show ineffective assistance of counsel. *See Strickland* at 687-689; *Hackney* at ¶ 37-38. We overrule his sixth assignment of error.

### VII. Weight and Sufficiency

{¶57} In his seventh assignment of error, Wright contends that the evidence was insufficient to support his conviction. Our review of the record shows that a

rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found that the state proved beyond a reasonable doubt all of the elements of aggravated murder, along with the accompanying specifications. Therefore, the evidence was sufficient to support the conviction. *See State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *Hackney* at ¶ 29.

{¶58} Wright argues that no physical evidence linked him to the offense. This argument ignores the fact that Wright's fingerprints were found on the outside of the SUV that Parks was driving. But even if his fingerprints had not been found, no rule of law exists that a witness's testimony must be corroborated by physical evidence. *Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, at ¶ 45. He also argues that the state's evidence was not credible. But in deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses. *Id.*

{¶59} Wright also argues that the conviction was against the manifest weight of the evidence. After reviewing the record, we cannot say that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial. Therefore, the conviction was not against the manifest weight of the evidence. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Blair*, 1st Dist. Hamilton Nos. C-100150 and C-100151, 2010-Ohio-6310, ¶ 24. Again, Wright argues that the state's evidence was not credible, but matters as to the credibility of evidence are for the trier of fact to decide. *State v. Bryan,* 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 116; *Thomas* at ¶ 48. Therefore, we overrule Wright's seventh assignment of error.

### VIII. Sentencing Notification

{¶60} Finally, in his eighth assignment of error, Wright contends that the trial court erred by failing to inform him at sentencing about the requirement to submit to DNA testing and the consequences for failing to do so under R.C. 2901.07(B). But he acknowledges that this court has held that the statute does not confer any substantive rights on the defendant. Therefore, the court's failure to notify Wright about DNA testing was harmless and did not prejudice him. *See State v. Taylor*, 1st Dist. Hamilton No. C-150488, 2016-Ohio-4548, ¶ 5-6. Consequently, we overrule his eighth assignment of error.

### IX. Summary

{¶61} In sum, we find no merit in Wright's assignments of error. The trial court committed no reversible error, and Wright received a fair trial. Consequently, we affirm the trial court's judgment.

Judgment affirmed.

**CUNNINGHAM** and **ZAYAS, JJ.,** concur.

Please note:
    The court has recorded its own entry this date.