[Cite as *State v. Williams*, 2020-Ohio-1228.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-180291 |
| | | TRIAL NO. B-1600860 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| DONTA WILLIAMS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: March 31, 2020

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Melynda J.  Machol*, Assistant Prosecuting Attorney, for Plaintiff-Appellee.

*Bryan R. Perkins*, for Defendant-Appellant.

**WINKLER, Judge.**

{¶1} Following a jury trial, defendant-appellant Donta Williams was convicted of murder under R.C. 2903.02(A) and tampering with evidence under R.C. 2921.12(A)(1). He now appeals those convictions. We find no merit in his six assignments of error, and we affirm the trial court's judgment.

### *Factual Background*

{¶2} The record shows that on February 13, 2016, about 9:00 a.m., a resident of Tulsa Court heard a loud noise outside his home. He looked out and saw that a car had crashed into a telephone pole. He called 911.

{¶3} Police and emergency crews responded to the scene, and found Derrick Johnson dead in the driver's seat. The car was still running, and Derrick had what appeared to be a gunshot wound on the left side of his face, near his ear.

{¶4} No shell casings were found at the scene, causing police to believe that Derrick had been shot with a revolver. One bullet was found lodged in a seatbelt, and there was a bullet hole in the pillar behind the driver's side front door. Police also found a coat, later identified as Williams's coat, nearby.

{¶5} A coroner performed an autopsy on Derrick. She determined that he had died from injuries caused by three bullets that penetrated his skull, right arm, and right shoulder. The first bullet went through his head. The other two damaged his lungs, ribs, blood vessels, and vertebra. The coroner also determined that all shots were fired from right to left from a distance of three feet or more, consistent with being fired from the passenger side of the car.

{¶6} A firearm examiner determined that the bullet recovered from the seatbelt and the bullets recovered from Derrick's body during the autopsy were fired

from the same weapon. The bullets were consistent with having been fired from a .38- or .357-caliber revolver.

{¶7} Around 11:00 a.m. that same day, police informed Derrick's mother, Tisha Johnson, of his death. They learned that Williams and Derrick were cousins, and that they had been together the night before making music at Derrick's apartment. Later that day, Williams called his father, John Johnson, and said, "I killed Derrick." John stated that Williams was crying, and was "real emotional," but he gave no reason for the shooting. Family members met Williams at the police department, where he turned himself in.

{¶8} Family members testified that on February 12, 2016, the night before Derrick's body was found, Williams was at Tisha's house, along with other family members, and "everybody was having a good time." Tisha stated that Williams was "so happy" and the family was all taking pictures in Tisha's kitchen.

{¶9} Derrick had tried to come to the gathering, but could not find a parking place, so he left. Derrick and Williams were close. They had a "great relationship" and they were always together, making "beats" and spending time with the family. Derrick called Williams that night and asked him to come over to his apartment to "make some money doing music." Derrick said he would bring Williams home the next day. Williams's father dropped him off at Derrick's apartment.

{¶10} Derrick lived with his girlfriend Andrea Henderson. After Derrick picked Henderson up at work, Williams greeted her in what she felt was an unusual way, but she did not think about it too much because "sometimes people are in a bad mood." She spent most of the night in the bedroom and did not interact much with

Williams. Henderson also said that the cousins were "getting along just fine," and that Derrick did not carry a gun.

{¶11} Williams and Derrick stayed up drinking beer, smoking marijuana, and listening to music. Williams slept on the couch or the floor. The next morning, at approximately 8:30 a.m., Derrick and Williams left. Derrick told Henderson that he would take Williams home, and then he would be back to take Henderson to work. He never returned.

{¶12} Williams told police that Derrick was going to drop him off at his uncle's house. As Williams was getting out of the car, Derrick threatened to kill him and reached for his pocket. Williams said that "my paranoia, schizophrenia kind of kicked in," and he shot at Derrick's legs. He did not know how many shots he fired, but stated that he did not mean to kill Derrick. He added, "my paranoia is at an all-time high, because I always think people trying to kill me for some reason."

{¶13} Williams added that he and Derrick had been raised together, that they were "tight" and "never shared anything but love." But, he said that he had been feeling an aggressive "energy" from Derrick, which he attributed to his own paranoia. He indicated that he had been diagnosed with "paranoia," but that he had stopped taking his medication because it made him lose weight. He also indicated that he had a "bad" and "damaged" memory from a "knockout" when he was 15 years old.

{¶14} After Williams shot Derrick, he fled and "dumped" the gun, although he did not know where. He also got rid of his coat. He took the bus to the Westin Hotel downtown and tried to "call everyone he knew" to tell them what he had done. At some point, he went to his uncle's house, told his uncle that he had shot Derrick, and took a shower. After Williams found out that Derrick was dead, he met with family members and turned himself in to the police.

{¶15} John, Williams's father, testified that Williams "had problems" with "paranoia and stuff like that." He also knew that Williams carried a .357-caliber revolver, but did not see him with it at the family gathering on February 12. John testified that Williams feared for his life and thought that "somebody was after him." He didn't like that Williams was carrying a gun, and he wanted Williams to get psychological help. John said, "It wasn't making no sense to me why he was feeling like that. You know, he could never say no name, who was after him, why was his paranoia so intense, you know." He also said that Williams seemed in good spirits at the family gathering and that he was not afraid of Derrick at all.

{¶16} Tisha testified that Williams was a like a son to her, and that Williams and Derrick were "like brothers." When asked about Williams's paranoia, she said that he was "always looking for the easy way out of life." She also said that Williams once told her that he wanted people to believe that he was crazy so he could receive money from the government and would not have to work. She added that Williams was "perfectly normal and fine" around her.

### *Batson Challenge*

{¶17} In his first assignment of error, Williams contends that the trial court erred by permitting the state to use a peremptory challenge to dismiss a prospective African-American juror. He argues that the state failed to provide a legitimate and credible race-neutral reason for striking the juror. This assignment of error is not well taken.

{¶18} In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that the Equal Protection Clause of the United States Constitution precludes purposeful discrimination by the state in the exercise of preemptory challenges so as to exclude members of minority groups from

petit juries. *State v. O'Neal*, 87 Ohio St.3d 402, 409, 721 N.E.2d 73 (2000); *State* v. *Wright*, 2017-Ohio-1568, 90 N.E.3d 162, ¶ 19 (1st Dist.). *Batson* established a three-step procedure for evaluating claims of racial discrimination in the use of peremptory challenges. *State v. White*, 85 Ohio St.3d 433, 436, 709 N.E.2d 140 (1999); *Wright* at ¶ 19.

{¶19} First, the opponent of a peremptory strike must make a prima facie showing of discrimination. Second, the proponent of the strike must give a race-neutral explanation for the strike. *State v. Herring*, 94 Ohio St.3d 246, 255-256, 762 N.E.2d 940 (2002); *Wright* at ¶ 20. The state's reason is deemed to be race-neutral unless discriminatory intent is inherent in the explanation. *State v. Durgan*, 1st Dist. Hamilton No. C-170148, 2018-Ohio-2310, ¶ 31; *Wright* at ¶ 20. Third, the trial court must determine whether, under all the circumstances, the opponent has proven purposeful discrimination. *Herring* at 256; *Wright* at ¶ 20.

{¶20} In step three, the trial court may not simply accept a proffered race-neutral reason at face value. Instead, it must examine the context to ensure that the reason is not merely pretextual. If the trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge, the juror may not be excluded. *State v. Frazier,* 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 65; *Durgan* at ¶ 32.

{¶21} The burden of persuasion always stays with the opponent of the strike. A reviewing court will defer to the trial court's finding that no discriminatory intent existed since it turns largely on an evaluation of credibility. *Herring* at 256; *Wright*, 2017-Ohio-1568, 90 N.E.3d 162, at ¶ 21. The reviewing court may only reverse a trial court's finding if that finding is "clearly erroneous." *Hernandez v. New York*, 500 U.S. 352, 365-366, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *Wright* at ¶ 21.

6

{¶22} The prosecutor used a peremptory challenge to excuse juror number six. When the prosecutor asked the jurors if they, or any family member or friend, had been charged with a crime, juror number six said that he was convicted in 2008 in a "drug case" involving crack cocaine in Butler County. He stated that his home was raided by police, and that he served six months' incarceration. He also stated that he was addicted to drugs at the time and had sought treatment for that addiction. He denied that he had ever been put on probation.

{¶23} Subsequently, the court questioned juror number six in chambers. At that time, he said that his conviction was a misdemeanor, that he had served jail time, and that he had not been placed on probation or parole. The prosecutor obtained the juror's criminal history, which did not show a drug charge in Butler County. It showed convictions for domestic violence, disorderly conduct, and drug abuse. It also showed that the juror had been charged with felonious assault, but had been acquitted on that charge.

{¶24} The prosecutor asked the court to remove the juror for cause for lying to the court about his criminal record. Defense counsel objected, stating that there was no reason to remove the juror for cause and that the prosecutor could use a peremptory challenge.

{¶25} The court again questioned the juror in chambers. It asked the juror why he did not disclose his prior criminal contacts on the jury questionnaire, which specifically asked if he or a member of his family "had ever been charged with a crime." The juror said, "I didn't know I was supposed to mention everything." The juror maintained that he had not forgotten them, but that he didn't know that he was supposed to disclose them. The court asked, "You didn't know those were necessary

7

to be answered?" and the juror replied, "Yeah." The court then asked, "You didn't think we needed that much information or detail?" and the juror said, "Pretty much."

{¶26} The juror acknowledged being charged with felonious assault after cutting a man with a box cutter, but indicated that he was acquitted based on a claim of self-defense. He also acknowledged being charged twice with domestic violence, but said that he did not disclose those offenses because he "didn't go to jail for it or nothing." He also acknowledged being twice convicted of disorderly conduct and being put on probation, and going "to jail for child support." He said that he thought he didn't have to disclose them because they happened a long time ago. He also denied purposely misleading the court.

{¶27} The prosecutor again moved to dismiss the juror for cause, which the trial court denied. It stated that "if he was really trying to mislead us, he wouldn't mention drug abuse or anything at all to begin with." It further stated that the juror did not understand the question on the questionnaire very well and that it did not think the juror was deliberately trying to mislead the court.

{¶28} The prosecutor later used a peremptory challenge to remove juror number six. The state did not use any other peremptory challenges. Williams objected. We note that at first, the prosecutor said that under *Batson*, "there has to be a pattern. There's definitely not a showing of a pattern at all." But the existence of a pattern of discriminatory strikes is not a prerequisite to prevailing on a *Batson* challenge. *White*, 85 Ohio St.3d at 436, 709 N.E.2d 140; *State v. May*, 2015-Ohio-4275, 49 N.E.3d 736, ¶ 48 (8th Dist.).

{¶29} At first, the trial court stated, "Under *Batson*, you have to state and give a race-neutral reason, you haven't done that." The prosecutor replied:

8

Judge, he lied to the court. He lied under oath. He said he never had any of his convictions. He does. And for that reason—Judge, that's enough in and of itself.

You know, he said he had a felonious assault that was—he said a self-defense case. This may be a self-defense case. I don't know. That's what he told the police officers, that he shot because he had to. He thought the other guy was going for a gun. He would not be a good juror for that reason.

And, additionally, more importantly, he did lie to the Court about his prior convictions. And the excuse he gave was extremely flimsy and unbelievable as far as why he didn't disclose that to us.

The court then stated, "Well, as far as a race-neutral reason under *Batson*, I will accept that as meeting the requirements of *Batson*."

{¶30} Thus, the prosecutor provided race-neutral reasons for use of the peremptory challenge. Courts have upheld the denial of *Batson* challenges for similar reasons. *See May* at ¶ 51; *State v. Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-Ohio-6716, ¶ 25; *State v. Jordan*, 167 Ohio App.3d 157, 2006-Ohio-2759, 854 N.E.2d 520, ¶ 39 (1st Dist.). This court has specifically stated that a juror's lack of candor or dishonesty in voir dire is a valid race-neutral reason for challenging that juror. *Tibbs* at ¶ 25; *Jordan* at ¶ 39. The trial court's acceptance of those race-neutral reasons was not clearly erroneous, and we overrule Williams's first assignment of error.

### Evidence of Williams's Mental State

{¶31} In his second assignment of error, Williams contends that the trial court erred by permitting the state to present evidence and repeatedly make

comments about Williams's mental state. He argues that the comments were irrelevant and prejudicial, particularly comments that Williams was faking mental illness, and that the admission of evidence regarding his mental state violated Evid.R. 401, 403, and 404. This assignment of error is not well taken.

**{¶32}** The decision whether to admit or exclude relevant evidence rests within the trial court's discretion. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus; *State v. Hamm*, 1st Dist. Hamilton Nos. C-160230 and C-160231, 2017-Ohio-5595, ¶ 28. An appellate court will not disturb a trial court's decision admitting or excluding evidence absent an abuse of discretion and a showing that the accused has suffered material prejudice. *State v Martin*, 19 Ohio St.3d 122, 129, 583 N.E.2d 1157 (1985); *State v. Kennedy*, 2013-Ohio-4221, 998 N.E.2d 1189, ¶ 77 (1st Dist.); *State v. Hirsch*, 129 Ohio App.3d 294, 307, 717 N.E.2d 789 (1st Dist.1998).

**{¶33}** First, Williams failed to object to the state's references to his mental-health issues. Therefore, we can reverse only upon a finding of plain error. *See State v. Underwood*, 3 Ohio St.3d 12, 13, 444 N.E.2d 1332 (1983); *Wright*, 2017-Ohio-1568, 90 N.E.3d 162, at ¶ 49.

**{¶34}** Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. The question of whether evidence is relevant is "one which the trial court can resolve based on common experience and logic." *State v. Lyles*, 42 Ohio St.3d 98, 99, 537 N.E.2d 221 (1989).

**{¶35}** Williams acknowledges that his mental condition was a pretrial issue. He was evaluated numerous times for competency issues and for an insanity defense.

He was found competent to stand trial. The mental-health professionals eventually concluded that he was malingering and had "made unsophisticated attempts to appear mentally ill." Williams contends that the mental-health issues were resolved before trial, and that those issues were irrelevant during the trial.

{¶36} But, Williams's "paranoia" was his defense at trial. He claimed self-defense, and that his paranoia caused him to believe that the victim was going to harm him. In his interview with the police, he stated that he had stopped taking his medication and that his "paranoia, schizophrenia kicked in" causing him to shoot the victim. Nevertheless, he spoke lucidly to police and did not come across as mentally ill. By using his psychological state as a defense, he opened the door for the prosecution to rebut his claimed mental-health issues. *See State v. Hancock*, 12th Dist. Warren No. CA2007-03-042, 2008-Ohio-5419, ¶ 30.

{¶37} His behavior in court also made his mental health an issue. He mumbled to himself, stared vacantly, and behaved oddly in general in an attempt to feign mental illness. "A defendant's face and body are physical evidence." *State v. Brown*, 38 Ohio St.3d 305, 317, 528 N.E.2d 523 (1988). A prosecutor may comment on the defendant's physical appearance, demeanor and body language during trial. *State v. Green*, 90 Ohio St.3d 352, 373, 738 N.E.2d 1208 (2000); *State v. Bey*, 85 Ohio St.3d 487, 496-497, 709 N.E.2d 484 (1999); *Brown* at 317.

{¶38} Williams also claims that evidence regarding his mental health should have been excluded under Evid.R. 403(A), which provides that relevant evidence is not admissible if its "probative value is substantially outweighed by the danger of unfair prejudice." The decision whether to admit or exclude evidence under Evid.R. 403(A) rests within the trial court's discretion. *Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343, at paragraph two of the syllabus; *State v. Johnson*, 1st Dist. Hamilton No. C-

170371, 2018-Ohio-4131, ¶ 36. An appellate court will not disturb the trial court's decision to admit or exclude evidence absent an abuse of discretion and a showing that the accused has suffered material prejudice. *Martin*, 19 Ohio St.3d at 129, 483 N.E.2d 1157; *Johnson* at ¶ 36.

**{¶39}** While evidence of Williams's attempts to feign mental illness was undoubtedly prejudicial, the rule only requires exclusion for "unfair prejudice." The evidence was not presented solely for the purpose of appealing to the jurors' emotions, sympathies or biases, but instead it was presented to counter Williams's defense that he shot Derrick due to his paranoia. *See State v. Bell*, 2015-Ohio-1711, 34 N.E.3d 405, ¶ 48 (1st Dist.). Consequently, the trial court did not abuse its discretion by admitting evidence regarding Williams's mental health or in allowing the state to comment upon it. We overrule William's second assignment of error.

### *Prosecutorial Misconduct*

**{¶40}** In his third assignment of error, Williams contends that he was denied a fair trial due to prosecutorial misconduct. He argues that the trial court permitted the prosecutor to argue about matters not in evidence, as well as irrelevant and improper character evidence, and to disparage defense counsel in front of the jury. This assignment of error is not well taken.

**{¶41}** Prosecutors are normally entitled to wide latitude in their remarks. *State v. Mason*, 82 Ohio St.3d 144, 162, 694 N.E.2d 932 (1998); *State v. Wallace*, 1st Dist. Hamilton No. C-160613, 2017-Ohio-9187, ¶ 65. The test for prosecutorial misconduct is (1) whether the remarks were improper, and (2) if so, whether the remarks affected the accused's substantial rights. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990); *Wallace* at ¶ 65. The conduct of the prosecuting attorney

cannot be grounds for error unless it deprives the defendant of a fair trial. *State v. Keenan*, 66 Ohio St.3d 402, 405, 613 N.E.2d 203 (1993); *Wallace* at ¶ 65.

**{¶42}** Many of Williams's arguments are a rehash of arguments we have already rejected in his second assignment of error. Additionally, he failed to object to many of the comments he now claims were improper. Thus, he cannot raise those issues on appeal unless they rise to the level of plain error. *See Underwood*, 3 Ohio St.3d at 13, 444 N.E.2d 1332; *Wallace* at ¶ 66.

**{¶43}** Most of the comments about which Williams complains were not improper. Nevertheless, the prosecutor made statements to the effect that the defense attorneys were "just doing their job." Those comments were improper since they imputed insincerity to defense counsel by suggesting that counsel believed that Williams was guilty. *See State v. Clemons*, 82 Ohio St.3d 438, 452, 696 N.E.2d 1009 (1998); *Keenan* at 405-406. Comments to that effect by the prosecutor were improper.

**{¶44}** But even though some of the prosecutor's comments were improper, none were so egregious as to affect Williams's substantial rights or to deny him a fair trial, much less rise to the level of plain error. *See State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22; *Wright*, 2017-Ohio-1568, 90 N.E.3d 162, at ¶ 53. Consequently, we overrule Williams's fifth assignment of error.

### Weight and Sufficiency

**{¶45}** In his fourth assignment of error, Williams contends that the evidence was insufficient to support his convictions. He contends that the evidence proved that he acted in self-defense in shooting the victim. This assignment of error is not well taken.

**{¶46}** Self-defense is an affirmative defense, which legally excuses criminal conduct. *State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990); *State v. Eichelbrenner*, 1st Dist. Hamilton No. C-110431, 2013-Ohio-1194, ¶ 19. The accused bears the burden of going forward with evidence of an affirmative defense and the burden of proving the defense by a preponderance of the evidence. Former R.C. 2901.05(A); *Eichelbrenner* at ¶ 19.

**{¶47}** A review for sufficiency of the evidence does not apply to affirmative defenses, because this review does not consider the strength of the defense evidence. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 37-38; *State v. Morris*, 10th Dist. Franklin No. 05AP-1139, 2009-Ohio-2396, ¶ 25. The test for sufficiency focuses only on the substantive elements of the charged offense, not the defendant's legal justification for his actions. *State v. Cooper*, 170 Ohio App.3d 418, 2007-Ohio-1186, 867 N.E.2d 493, ¶ 15 (4th Dist.). Thus, Williams cannot challenge the jury's rejection of his claim of self-defense on sufficiency grounds. *Morris* at ¶ 25; *Cooper* at ¶ 15.

**{¶48}** Our review of the record shows that a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found that the state proved beyond a reasonable doubt all of the elements of murder under R.C. 2903.02(A) and tampering with evidence under R.C. 2921.12(A)(1). Therefore, the evidence was sufficient to support the convictions. *See State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *State v Hackney*, 1st Dist. Hamilton No. C-150375, 2016-Ohio-4609, ¶ 29. We overrule Williams's fourth assignment of error.

{¶49} In his fifth assignment of error, Williams contends that his convictions were against the manifest weight of the evidence. Again, he argues that the evidence proved that he acted in self-defense. This assignment of error is not well taken.

{¶50} To prove self-defense, the accused must show that (1) he was not at fault in in creating the situation giving rise to the affray, (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of force, and (3) that he did not violate a duty to retreat or avoid the danger. *Williford*, 49 Ohio St.3d at 249, 551 N.E.2d 1279; *State v. Edwards*, 1st Dist. Hamilton No. C-110773, 2013-Ohio-239, ¶ 5. The elements of self-defense are cumulative. If the defendant fails to prove any one of these elements, he has failed to demonstrate that he acted in self-defense. *Williford* at 249; *Eichelbrenner*, 1st Dist. Hamilton No. C-110431, 2013-Ohio-1194, at ¶ 23.

{¶51} As to the second prong, the defendant must demonstrate that he "reasonably believed that some force was necessary" to defend himself against the imminent use of force. *Eichelbrenner* at ¶ 21. In this case, defendant claimed that his use of force to defend himself was based on his paranoia. Thus, by his own admission, it was not based on a reasonable belief that he needed to use force.

{¶52} The trial court instructed the jury on self-defense. The jury heard the evidence and found Williams's claim of self-defense not to be credible. Matters as to the credibility of evidence were for the trier of fact to decide. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 116; *State v. Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, ¶ 48.

{¶53} After reviewing the record, we cannot say that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse the convictions and order a new trial. Therefore, the convictions were not against the

manifest weight of the evidence. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Cedeno*, 192 Ohio App.3d 738, 2011-Ohio-674, 950 N.E.2d 582, ¶ 25 (1st Dist.). We overrule Williams's fifth assignment of error.

### *Cumulative Error*

**{¶54}** Finally, in his sixth assignment of error, Williams contends that the trial court's cumulative errors led to a wrongful verdict in violation of his right to due process. The cumulative effect of errors may deprive a defendant of a fair trial even though the individual instances of error do not warrant a reversal. The defendant must demonstrate that a reasonable probability exists that the outcome of the trial would have been different absent the alleged errors. *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus; *Bell*, 2015-Ohio-1711, 34 N.E.3d 405, at ¶ 49.

**{¶55}** The evidence against Williams was overwhelming. He has not demonstrated that the outcome of the trial would have been different absent the alleged errors, given the quantum of evidence against him. *See Bell* at ¶ 51; *State v. Lukacs*, 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, ¶ 68 (1st Dist.). Therefore, we overrule Williams's sixth assignment of error and affirm the trial court's judgment.

Judgment affirmed.

**MOCK, P.J.,** and **MYERS, J.,** concur.

Please note:
The court has recorded its own entry this date.