[Cite as *State v. Arnold*, 2020-Ohio-2706.]

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-180664 |
| | | C-180670 |
| Plaintiff-Appellee, | : | TRIAL NO. B-1604105 |
| vs. | : | *O P I N I O N.* |
| WILLIAM ARNOLD, | : | |
| Defendant-Appellant. | : | |


Criminal Appeals From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: April 29, 2020


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Paula E. Adams*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy J. McKenna*, for Defendant-Appellant.

**WINKLER, Judge.**

{¶1}    Following a jury trial, defendant-appellant William Arnold was convicted of one count of reckless homicide under R.C. 2903.041, one count of felonious assault under former R.C. 2903.11(A)(1), one count of abduction under R.C. 2905.02(A)(2), and one count of tampering with evidence under R.C. 2921.12(A)(1).  We find no merit in his five assignments of error, and we affirm his convictions.

### I.  Factual Background

#### A.  The Victim is Severely Injured

{¶2}    The record shows that on February 29, 2016, at about 12:30 a.m., Rhonda Byrd received a call from her 16-year-old daughter, Hailey Hall.  Hall asked Byrd to pick her up at Inner Circle Night Club, also known as Annie's Night Club.  Byrd told Hall she would need a few minutes to get dressed and find the location of the night club.  Once she was ready, Byrd called Hall back.  A man answered Hall's phone.  Byrd described the man's voice as deep, like that of a middle-aged black man.  Hall then got on the phone, and said she had a ride and she would be home "in a little bit."

{¶3}    But Byrd did not see her daughter until 2:40 p.m. the following day.  When Hall did not come home, Byrd called her phone repeatedly, but got no answer.  She started calling hospitals.  Eventually, one of Hall's friends called Byrd and told her that Hall was at Mercy Hospital in Western Hills.  When Byrd arrived at the hospital, the doctor told her that Hall's injuries were "like getting hit by a Mack truck and he didn't know if she would make it or not."

{¶4} Hall was taken by air care to University Hospital, which had a level-one trauma center. Byrd said that her daughter's face was so swollen, she was unrecognizable. She "had bruises from head to toe" and "scratches all over her body." Her long, dark hair was matted and had leaves in it. Eventually, doctors told Byrd that Hall's "brain stem was dead." She was taken off life support and passed away.

{¶5} Byrd did not know Arnold. Unbeknownst to Byrd, Hall had been dating Arnold, who was a drug dealer. Byrd believed her daughter was staying with friends the night she was injured.

{¶6} Ashley Emerson was Hall's best friend. She knew that Arnold was Hall's boyfriend and that they had been dating since Christmas 2015. On February 28, Hall called Emerson and told her to come to Annie's. Emerson said she could not come, and stayed home.

{¶7} The next morning, Emerson woke up sometime between 9:00 and 10:30 a.m. and saw that she had missed calls from Arnold's phone. She called him back several times. When he finally answered, she heard him say, "[F]uck that bitch. That ho got what she deserved." He hung up, and Emerson called him back.

{¶8} When Arnold answered again, he said that "she's not breathing right." Emerson asked to talk to Hall. Emerson asked Hall to say that she was alright, and all Emerson heard was a noise. Emerson said it "was like she couldn't breathe, she couldn't talk." Emerson told Arnold to take Hall to the hospital, and hung up the phone.

{¶9} Emerson got into her car and tried to find Hall. She talked with Arnold again around noon, when Arnold told her that Hall had been jumped by eight to ten black girls at the night club, which was the first time he had mentioned that.

Emerson asked him where he was, if he had taken Hall to the hospital, and several other questions. Arnold told her "nothing."

{¶10} Emerson did not see Hall again until two days later at University Hospital. Emerson said that "her whole body was swollen and her head was so big and it did not look like Hailey at all."

### B. Arnold Waits to Take the Victim to the Hospital and Conducts Drug Deals

{¶11} Richard Lawson was a heroin addict and one of Arnold's customers. He knew Arnold as "Grease." Sometime during the late night hours of February 28 or the early morning hours of February 29, Lawson called Arnold to arrange a purchase. Arnold told Lawson that the heroin would be in the gas tank of his car, a dark-colored BMW, which was parked at Annie's Night Club, and that he should leave the money in there.

{¶12} Lawson had difficulty locating the car because it was pouring rain that night. When he finally found the car, he could not get into the gas tank because it was a newer BMW that required a key. Lawson called Arnold several times, and Arnold eventually came out of the night club. When Arnold removed the package of heroin from the gas tank, it was wet. Lawson and Arnold got into the car while Arnold made him a new pack of heroin. Lawson indicated that the car was parked on a lot made of pavement, not gravel.

{¶13} Lawson testified that he saw Hall, whom he knew from previous dealings with Arnold, running toward the car. He said to Arnold, "[H]ey, there's your girl." Arnold seemed agitated and said, "[A]h, fuck her, she'll be alright."

{¶14} The following night, Lawson wanted to arrange another purchase from Arnold. He had to call Arnold several times before he answered. He arranged to meet Arnold on McMicken Street. Arnold was late and told Lawson to bear with him

because "he had a lot going on." Arnold was on his phone for the whole transaction and seemed agitated.

{¶15} Paul Fangman, an agent for the Regional Narcotics Unit of the Hamilton County Sheriff's Department, saw Arnold the morning of February 29 at the Budget Host Hotel on Central Parkway. Agent Fangman was conducting surveillance of Arnold for a separate investigation. He had seen Arnold and Hall together on five separate occasions. At approximately 8:00 a.m., Fangman located Arnold's car, a dark-colored BMW with a temporary Kentucky license plate, at the hotel.

{¶16} From the hotel lobby, Fangman saw Arnold exit from room 105 at approximately 10:50 a.m. He came to the lobby and spoke with the hotel clerk. Arnold wanted to extend his stay at the hotel, but the clerk asked for his identification, which Arnold said he did not have. Fangman then saw a small female, later identified as Paige Flanigan, arrive at the hotel and head toward a recessed area where room 105 was located.

{¶17} At 11:10 a.m., Arnold came out of the room again. He placed a clear garbage bag with what appeared to be clothing inside into the trunk of the BMW, and then returned to the room. A few minutes later, he came out of the room again carrying what Fangman thought was a ten- or 11-year-old child in his arms. That person also appeared to be sleeping or unconscious. Agent Fangman testified that in hindsight, he believed that Arnold could have been carrying Hall. Although he could not see the face of the person Arnold was carrying, he could see that she had long, dark hair. Flanigan came out of the room with Arnold and opened the passenger door of the BMW. Arnold placed the person he was carrying in the vehicle. Arnold and Flanigan then left in separate vehicles.

5

{¶18} Flanigan knew Arnold as "Grease" or "G." She often saw Hall with Arnold when she purchased heroin from Arnold. On February 29, Flanigan had an appointment at noon and wanted to meet with Arnold to buy heroin before then. She called Arnold multiple times, but her calls went straight to voicemail. Flanigan decided to go to the Budget Host Hotel, since she knew that Arnold would be staying there.

{¶19} When Flanigan arrived, she just happened to see Arnold walking out of the room. When she went inside, she saw Hall lying on the bed. She said that Hall's body was bruised and her face was swollen. She was breathing heavily. Flanigan tried to wake Hall, but she did not respond. She saw a bloody towel on a chair and blood on the bathroom floor.

{¶20} Arnold was moving around the room, "getting things together." Flanigan said he appeared "scattered" and "nervous." He kept saying it that it was the worst day of his life. He said that he and Hall "had gotten into it." Flanigan asked, "[W]hat was so bad that it came to this?" Arnold only said, "I don't know, I don't know."

{¶21} Flanigan told Arnold that he should take Hall to a hospital. Arnold said that he would. He continued to take things from the room to the car. When Arnold picked Hall up from the bed, Hall's head went limp. Flanigan pushed Hall's hair out of her face and pulled her shirt down because she had visible marks and bruises. Then, at Arnold's direction, Flanigan looked out the door to make sure that no one was looking. Arnold carried Hall to the car and put her in the front seat.

{¶22} Arnold and Flanigan drove away in their separate vehicles and met less than a mile away from the hotel to complete the drug sale. Flanigan got into the back seat of Arnold's car. She saw blood all over the dashboard, a bloody clump of long,

dark hair in the handle of the glove compartment, and blood on the passenger side door. She also saw Hall's purse in the back seat. After the drug sale, Flanigan left. She said that she did not call 911 because she was a heroin addict and she was afraid that Arnold would get mad and hurt her.

{¶23} Flanigan saw Arnold later that evening to purchase more heroin. Hall was not in the car, but her purse was still in the back seat. When Flanigan asked how Hall was doing, he said, "[N]ot good." Arnold told her that Hall's family and friends were mad at him because Hall got jumped by girls at the club on his watch. Flanigan thought it was strange that he had not previously mentioned that she had been jumped.

{¶24} Erin Chasteen was one of Arnold's customers, and knew him as "Mike." She received a call from him on the morning of February 29. She could hear a "commotion in the background," so she hung up and called him back. He apologized for calling her and said, "[T]here was something wrong." Chasteen called him back and arranged to meet him to buy heroin.

{¶25} About noon, Chasteen met Arnold at a park. When she pulled up, he was wiping the passenger door of his car with a white cloth. She said that "he was not his normal self." He seemed "very anxious and nervous" and paced back and forth.

{¶26} Chasteen noticed Hall unconscious in the front passenger seat of Arnold's car. Her face was so bruised and swollen that Chasteen hardly recognized her. Chasteen had worked as a medical assistant before her drug problem. She found that Hall still had a pulse, but she was cold. Her breathing was raspy "like a death rattle." Chasteen could hear fluid in Hall's lungs.

{¶27}  Chasteen asked Arnold, "[W]hat the fuck did you do?"  He told her that they had been in a club.  He thought that Hall had been talking to someone else and they had gotten into a fight.  He said that things had gotten out of hand and he had not meant for it to go that far.  He was worried that Hall had brain damage.  He asked Chasteen to take Hall to the hospital, but Chasteen refused because she knew that she was wanted in two states.  She told Arnold that he needed to take Hall to the hospital.

{¶28}  Jennifer Horton was another one of Arnold's customers.  On February 29, she too made arrangements to buy heroin from Arnold.  He came and knocked on her door, which was unusual.  Usually, he called her, and she came out of the house.  She let him in, and noticed that "he seemed a little off, like he paced back and forth."

{¶29}  After they completed the drug sale, Arnold commented that "she needed to go to the hospital."  When Horton asked him who, he said that Hall had been jumped by eight or nine black girls at Annie's.  Horton, who had known Hall since she was a child, went out to the car to see her.  Horton stated that Hall was unrecognizable.  She had marks on her neck as if she had been choked.  She had bruises and she was bloody, but there was no blood on her clothes.  Hall was unresponsive and barely breathing, as if it hurt for her to breathe.

{¶30}  Horton admitted that she went into her house to take her drugs.  Then she got into the back seat of Arnold's car so that they could take Hall to the hospital.  Arnold put Hall in the back seat with Horton.  Horton stated that Hall's eyes were open, but she was unresponsive.  Arnold drove up the road to Mercy Hospital.  When they arrived at the hospital, his voice quivered and he said, "I didn't mean to do it, she didn't deserve it, I didn't mean to hurt her."

**{¶31}** Horton testified that Arnold went into the hospital and got a wheelchair. He put Hall in the wheelchair and went to the door. He banged on the door to get people's attention. Two nurses came out and got Hall and took her inside. Arnold then left. Horton filled out the paperwork and stayed until Hall's family arrived. Horton told the family that Hall had been jumped by eight or nine black girls, even though she knew it was untrue, because she was scared.

### C.  The Police Investigation

**{¶32}** At approximately 5:00 p.m. on February 29, Cincinnati Police Detective Charles Zopfi arrived at University Hospital. He described Hall's condition as "horrific." He added,

> [H]er head was the size of a basketball, every bit the size of a full, inflated basketball. Her eyes were swollen shut. She had scrapes and contusions all about her face. She had bruising and marks on her throat area. She had marks and scrapes and bruising all along her arms on both sides.
>
> * * *
>
> She had dark bruising on her knees, with lacerations and some contusions, and that continued all the way down to her feet. She was missing numerous nails on both hands and she had a large amount of bruising on the top of her head and there was what appeared to be dried blood in her hair.

**{¶33}** Detective Zopfi spoke with Hall's mother and three of her friends to find out where Hall had been before being brought to the hospital. He was able to obtain video surveillance footage from Annie's Night Club and the Budget Host Hotel.

9

{¶34} Video from the hotel dated February 28 showed that Arnold and Hall had arrived at the hotel together. Arnold wore a letterman jacket. The chest and back of the jacket were either dark blue or dark green, and it had tan sleeves. He also wore a white tee shirt underneath, faded blue jeans and white tennis shoes. Hall wore a pink-black-gray-and-white-striped sweater, cream-colored tights or leggings and black wedge heels. Subsequently, Arnold and Hall got in the dark-colored BMW and left the parking lot.

{¶35} Video from Annie's showed Arnold wearing a white tee shirt and carrying his letterman jacket and Hall in her striped sweater and cream-colored leggings moving around the club. Arnold left the club at 1:42 a.m.

{¶36} Video footage from the hotel showed the BMW returning at 4:05 a.m. Arnold got out and went into room 105 briefly. He then came back out, went to the passenger side of the BMW, and carried Hall into the room. Arnold was no longer wearing the letterman jacket, and Hall was wearing dark pants. Those pants were consistent with the pants she was wearing when she entered the hospital. Arnold went back out to the car that night at least twice.

{¶37} Detective Zopfi, Detective Mark Longworth and Agent Fangman interviewed Arnold. Arnold said that while he was in the club, he got an urgent text from Hall asking him to come outside. When he got to the exit, he was detained briefly and saw Hall walking to the parking lot. Several seconds later, he followed her to a gravel overflow parking lot, and saw her in an altercation with five black girls. He claimed he broke up the fight and told the girls to get away from his car.

{¶38} He said that Hall was conscious and responsive at that time, but had a bloody nose and some scrapes and bruises. He asked her if she wanted him to take her to the hospital and she said no, she wanted to go back to the hotel.

{¶39} Arnold said that once they arrived at the hotel, he carried her in and cleaned her up in the bathroom, where he noted a cut on her back. They watched television and eventually went to sleep. Arnold maintained that Hall was conscious the entire time. When they woke up the next morning, she was conscious and they had a conversation. She asked him to extend their stay in the room for another night. He went to the lobby, but could not. He came back to the room and told her that they would have to leave and that he would gather her belongings and put them in the car.

{¶40} Arnold said that a friend, whom he later acknowledged was Flanigan, came to the room. At that time, they found Hall unresponsive. He told Flanigan that Hall had been jumped by several girls at the club, and he asked Flanigan to assist him in taking Hall to the hospital. He said he could not sit at the hospital because he had errands to run.

{¶41} According to Arnold, he took Hall straight to Mercy Hospital in Western Hills. The detectives found that statement to be inconsistent, because the hotel was minutes away from several hospitals, including the major trauma centers, while Mercy Hospital was some distance away. When pressed for details, Arnold admitted to stopping at Horton's house on the west side of town. Zopfi stated that Arnold, Flanigan, and Hall left the hotel at approximately 11:00 a.m. They did not arrive at the hospital until after 1:00 p.m.

{¶42} Arnold also told the police that the dark-blue BMW he had been driving that night was a "street rental." He claimed it belonged to a girl named Cassie from Kentucky, that he did not know her last name, and that he had met up with her to return the car. However, the police officers found the car in the back yard

of Arnold's brother's house, along with some of Hall's belongings. Arnold's brother gave Hall's purse and some other items to the police.

{¶43} Eight police officers were working a detail at Annie's Night Club the night that Hall was injured. One of the officers testified that he made sure he had a view of the overflow parking lot. None of the officers saw any fights in the parking lots that night. There was only one fight inside the club. The officers remained in the parking lots until all of the patrons and staff of the nightclub had left.

{¶44} A deputy coroner from the Hamilton County Coroner's Office described the horrific injuries that Hall had suffered, including numerous bruises, a laceration of her liver, and massive head injuries, which caused blood to accumulate between her skull and her brain. Her brain swelled up so much that the coroner could see the brain swelling through the hole that was cut in her skull at the hospital to relieve the pressure. The coroner opined that, depending on the rate of the bleeding, Hall would likely have survived if she had gotten to the hospital sooner. The coroner also said that although Hall had some lacerations on her skin, they were likely due to blunt-force blows rather than cuts. She also stated that if Hall had been in a fight in a gravel parking lot as Arnold had claimed, she would have expected to see far more lacerations. Hall also had a stomp mark on her back, which was not consistent with being hit by a high-heeled shoe.

{¶45} A police criminalist used a substance called Luminal, which reveals the presence of blood and cleaning products when the lights are turned out, in the BMW. The Luminal showed the presence of blood and cleaning products on the dashboard and the passenger-side door and seat of the BMW that Arnold had been driving. There were smears of blood on the dashboard and droplets spattered on the windshield. Various blood spatters in the car were swabbed for DNA, which were all

identified as coming from Hall. There were also minor profiles that could not be identified. Arnold had claimed that the victim had a nose bleed from the fight she had been in at the club. But there were substantial amounts of blood in the car, far more than would be caused by a nose bleed.

### D. Arnold's Defense

{¶46} Arnold's friend Anthony Easton testified on Arnold's behalf. He said on the morning of February 29, he saw Arnold walk into the club with Hall around 12:30 a.m. It was crowded, and he went into the back of the club with Arnold, but Hall did not accompany them. He said that he did not notice anything strange between Arnold and Hall. He did not see Hall again that night. When he and Arnold got to the front of the club, Arnold noticed he had a lot of missed calls on his phone. Arnold made a phone call. He appeared worried as he talked, and he left the club.

{¶47} Arnold testified on his own behalf at trial. He said that he and Hall left the hotel about 11:00 p.m. to go to the club. It was crowed, so he parked in the gravel auxiliary lot across the street, which was not well lit. Hall told him she wanted to talk to some people, so they separated, but he said they were not arguing and he was not mad at her.

{¶48} Around 1:40 a.m., Hall texted him that she was outside. After a brief delay getting out of the club, he got to the car and saw five or six black females hitting and stomping on Hall. When Hall fell to the ground, he became alarmed and angry. He restrained himself from hitting the women and shielded Hall from them. After he threatened the women, they left, and he helped Hall to the car.

{¶49} Arnold stated that Hall was talking and did not appear to be in pain. Her nose was bleeding and she had some scrapes and bruises. Her shirt had been ripped in the fight, so she ripped part of it off to stop the nosebleed. He asked her

several times if she wanted to go to the hospital, but she said that she was alright. She fell asleep in the car as he conducted several drug deals.

{¶50} They arrived at the hotel at around 4:00 a.m., and he carried her inside. When they got back in the room, she awoke and got into the bath tub, where Arnold saw her injuries. After that, they smoked a joint and fell asleep.

{¶51} Arnold said that when Flanigan arrived the following morning about 11:00 a.m., he realized Hall was unconscious. He believed she had been doing fine because she was a "tough girl" who knew herself and she had assured him that she was okay. He told Flanigan it was the "worst day of his life" due to Hall's condition. He knew there was an undercover agent in the lobby, so he carried Hall to the car. Then he and Flanigan left and drove down the road to conduct the drug deal. He said he was not thinking straight and acknowledged making bad decisions by conducting drug deals before taking Hall to the hospital. He denied hitting or assaulting her that night, and claimed he only left the hospital because he believed that she would be alright.

### E. The Convictions

{¶52} Arnold was indicted on two counts of murder, one count of felonious assault, one count of kidnapping, one count of abduction, and one count of tampering with evidence. The jury found him not guilty of the murder charges and the kidnaping charge. It found him guilty of the lesser offense of reckless homicide, felonious assault, abduction and tampering with evidence. The trial court refused to merge the reckless-homicide and abduction counts, and sentenced Arnold to a total of 17 years in prison. This appeal followed.

## II. Weight and Sufficiency

{¶53} In his first assignment of error, Arnold argues that the evidence was insufficient to support his convictions for felonious assault, abduction and tampering with evidence. In his second assignment of error, he argues that those convictions were against the manifest weight of the evidence. He does not challenge the reckless-homicide conviction, and concedes that he acted recklessly in failing to take Hall the hospital. He argues that the evidence shows that he did not intentionally commit the other offenses. These assignments of error are not well taken.

{¶54} Arnold was convicted of felonious assault under former R.C. 2903.11(A)(1), which provided that "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * *." A person acts knowingly, regardless of purpose, "when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶55} " 'Knowingly' does not require the offender to have the specific intent to cause a certain result. That is the definition of 'purposely.' " *State v. Huff*, 145 Ohio App.3d 555, 563, 763 N.E.2d 695 (1st Dist.2001). Whether a person acts knowingly can be gathered from the surrounding facts and circumstances, including the act itself. *State v. Bettis*, 1st Dist. Hamilton No. C-060202, 2007-Ohio-1724, ¶ 9; *Huff* at 563.

{¶56} The state's witnesses testified as to the severity of Hall's injuries. They stated that she was unrecognizable due to her injuries and that she was barely breathing. They also testified as to Arnold's comments that he and Hall "had gotten into it" and that things "had gotten out of hand." It was not until later that Arnold

changed his explanation and stated that Hall had been attacked by a group of girls in the gravel parking lot across the street. According to the coroner, Hall's injuries did not support that explanation. None of the eight police officers working details outside of the night club saw or heard an attack or a fight by a mob of girls. Given the severity of Hall's injuries, together with the other facts and circumstances, the jury could have reasonably inferred that Arnold acted knowingly in causing Hall's injuries. *See State v. Churn*, 8th Dist. Cuyahoga No. 105782, 2018-Ohio-1089, ¶ 20.

{¶57} Arnold's argument relies entirely on his version of events, which he claims was more credible. But in deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses. *State v. Wright*, 2017-Ohio-1568, 90 N.E.3d 162, ¶ 58 (1st Dist.).

{¶58} Arnold was also convicted of abduction under former R.C. 2905.02(A)(2), which provides that "[n]o person, without privilege to do so, shall knowingly * * * [b]y force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear." Force is "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." Former R.C. 2901.01(A)(1); *State v. Hornschmeier*, 2012-Ohio-2860, 973 N.E.3d 779, ¶ 41 (1st Dist.).

{¶59} Restraint of liberty means "to limit one's freedom of movement in any fashion for any period of time * * * ." *State v. Tajblik*, 6th Dist. Wood No. WD-14-064, 2016-Ohio-977, ¶ 17. A conviction does not turn on the manner in which the individual is restrained. Rather, the question is whether the restraint "is such to place the victim in the offender's power and beyond immediate help, even though temporarily." *Id.* at ¶ 18.

{¶60} Rather than taking Hall to get medical attention or home to her mother, Arnold took her to the hotel. Video from the hotel showed him carrying an unconscious Hall into the hotel room. Later that morning, he carried an unconscious Hall from the room and put her in the car. He then drove her from one drug deal to another. Although Arnold's customers were afraid to get involved, they urged him to take her to a hospital. All in all, it was over 11 hours after Hall had been beaten before Arnold took Hall to hospital. Thus, the state's evidence was sufficient to show the elements of abduction. *See State v. Crossty*, 2017-Ohio-8382, 99 N.E.3d 1048, ¶ 25-27 (1st Dist.). Again, Arnold's argument relies on his version of events, in which he claimed that Hall declined medical treatment and went with him willingly.

{¶61} Finally, Arnold was convicted of tampering with evidence under R.C 2921.12(A)(1), which provides that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]" Tampering with evidence requires a person to act with purpose, meaning that the person has a specific intention to cause a certain result. *State v. McGee*, 1st Dist. Hamilton No. C-150496, 2016-Ohio-7510, ¶ 28. The state may prove purpose, as well as the other elements of the offense, by circumstantial evidence. *Id.*; *In re J.T.*, 2014-Ohio-5062, 21 N.E.3d 1136, ¶ 8 (1st Dist.).

{¶62} Neither Hall's clothing nor Arnold's jacket that were seen in the club video were ever recovered. The evidence showed that attempts were made to clean the car. Arnold also claimed to have returned the car to its alleged owner, but it was found at his brother's house. Thus, the state presented evidence from which the jury could have reasonably inferred that Arnold acted with the requisite intent.

17

{¶63} Our review of the record shows that a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found that the state proved beyond a reasonable doubt all of the elements of felonious assault, abduction and tampering with evidence. Therefore, the evidence was sufficient to support the convictions. *See State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *State v. Hackney*, 1st Dist. Hamilton No. C-150375, 2016-Ohio-4609, ¶ 29.

{¶64} Further, after reviewing the record, we cannot say that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse the convictions and order a new trial. Therefore, the convictions were not against the manifest weight of the evidence. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Cedeno*, 192 Ohio App.3d 738, 2011-Ohio-674, 950 N.E2d 582, ¶ 25 (1st Dist.).

{¶65} Arnold is again arguing that his version of events is more credible. But matters as to the credibility of evidence were for the trier of fact to decide. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 116; *Wright*, 2017-Ohio-1568, 90 N.E.3d 162, at ¶ 59. Therefore, we overrule Arnold's first and second assignments of error.

### IV. Allied Offenses

{¶66} In his third assignment of error, Arnold contends that the trial court erred in failing to merge the reckless-homicide and abduction counts. He argues that they are allied offenses of similar import. This assignment of error is not well taken.

{¶67} As a general rule, we review a trial court's decision regarding allied offenses de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28; *State v. Murph*, 1st Dist. Hamilton No. C-150263, 2015-Ohio-

5076, ¶ 5. In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, the Ohio Supreme Court stated that in determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts "must evaluate three separate factors—the conduct, the animus, and the import." *Id.* at paragraph one of the syllabus.

{¶68} The court held:

Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus.

*Id.* at paragraph three of the syllabus.

{¶69} The defendant bears the burden to show that he is entitled to the protection provided by R.C. 2941.25 against multiple punishments for a single criminal act. *State v. Ziegler*, 2017-Ohio-7673, 97 N.E.3d 994, ¶ 20 (1st Dist.). "Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at paragraph two of the syllabus. Offenses are not allied offenses of similar import "if they are not alike in their significance and their resulting harm." *Id.* at ¶ 21.

{¶70} R.C. 2905.02(A)(2), abduction, provides that "[n]o person, without privilege to do so, shall knowingly * * * [b]y force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim

19

or place the other person in fear." R.C. 2903.041(A), reckless homicide, states that '[n]o person shall recklessly cause the death of another * * *."

{¶71} Arnold's actions were so severe and prolonged that the offenses were of dissimilar import. The basis for the reckless homicide was Arnold's failure to take Hall to the hospital. The record shows that her injuries were so severe that they required immediate hospitalization. Yet, Arnold restrained Hall's liberty by force repeatedly by taking her from place to place over the course of 11 hours. This series of forcible restraints of her liberty each created a separate risk of harm. *See Tajblik*, 6th Dist. Wood No. WD-14-064, 2016-Ohio-977, at ¶ 29.

{¶72} In finding that the offenses were separate, the trial court stated:

I have different acts that took place. There's driving her to the hotel

instead of the hospital. There's not calling an ambulance back at the

beginning. There's not calling an ambulance when he knew she had,

by his own admission[,] she had to go to the hospital. That might have

been the reckless homicide. There is the act of carrying her up into the

room, the act of carrying her back down into the car, the act of driving

her out to the west side, all separate acts. You say it's committed with

one animus, but I'm not sure how you support that, given that each

time he made the decision to do something.

{¶73} The court later rejected Arnold's arguments that the offenses should merge On the ground that there was only one mens rea, because intent was not the only consideration. It stated that Arnold had caused separate harms to the victim because "[e]ach time he made her condition more precarious."

{¶74} Finally, the court summarized,

20

To me, it seems that there were so many different acts, each of which exposed her to greater and greater risk of death, that each of these offenses is separately supported. Clearly, the abduction from whatever the event that caused the injuries * * * is separate from those acts. Calling an ambulance right then and there would have been the only proper course of action.

A separate decision was made to move her after that occurred and move her, not to a place of treatment and safety, but to a place where she would further deteriorate in the eyes of any reasonable person.

{¶75} We agree with the trial court's reasoning, and we hold that the offenses were of dissimilar import. Therefore, the trial court did not err in failing to merge the offenses of reckless homicide and abduction, and we overrule Arnold's third assignment of error.

### IV. Consecutive Sentences

{¶76} In his fourth assignment of error, Arnold contends that the sentences imposed were contrary to law. He argues that under R.C. 2929.41(A), a presumption exists for concurrent prison terms. He also argues that the record does not support the trial court's findings justifying the consecutive sentences. This assignment of error is not well taken.

{¶77} Before a reviewing court can modify or vacate a felony sentence, it must clearly and convincingly find that the sentence is contrary to law or that the record does not support the trial court's findings. Former R.C. 2953.08(G)(2); *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1; *State v. White*, 2013-Ohio-4225, 997 N.E.2d 629, ¶ 11 (1st Dist.).

{¶78} In Ohio, there is a statutory presumption in favor of concurrent sentences for most felony offenses. R.C. 2929.41(A); *State v. Harris*, 1st Dist. Hamilton Nos. C-170266 and C-170267, 2018-Ohio-2850, ¶ 8. The trial court may overcome that presumption by making the findings set forth in former R.C. 2929.14(C). *State v. Palazzolo*, 1st Dist. Hamilton No. C-150557, 2016-Ohio-7043, ¶ 13.

{¶79} Former R.C. 2929.14(C)(4) provided:

If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶80}** When imposing consecutive sentences, a trial court must make the required findings as part of the sentencing hearing and incorporate those findings in the sentencing entry. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus; *State v. Cephas*, 1st Dist. Hamilton No. C-180105, 2019-Ohio-52, ¶ 43. The court need not use "talismanic words," but the record must show that the court engaged in the requisite analysis and that the evidence supports the findings. *Cephas* at ¶ 43; *State v. Schwarm*, 1st Dist. Hamilton No. C-160677, 2017-Ohio-7626, ¶ 15. The record shows that the court engaged in the requisite analysis and made the findings at the sentencing hearing and in the judgment entry necessary to justify the imposition of consecutive sentences.

**{¶81}** Arnold also contends that the record does not support the trial court's findings. In *State v. Gwynne*, 158 Ohio St.3d 279, 2019-Ohio-4761, 141 N.E.2d 279, ¶ 16-17, the Ohio Supreme Court clarified that R.C. 2929.11 and 2929.12 apply only to a review of individual sentences, and R.C. 2953.08(G)(2) provides the "exclusive means of appellate review of consecutive sentences." *State v. Chandler*, 1st Dist. Hamilton No. C-190153, 2020-Ohio-164, ¶ 6.

**{¶82}** R.C. 2953.02(G)(2)(a) provides that a court of appeals may increase, reduce, or otherwise modify a sentence if it clearly and convincingly finds that "[t]he record does not support the sentencing court's findings under * * * division * * * (C)(4) of section 2929.14 * * * ." The record supports the trial court's consecutive-sentences findings, which were based on Arnold's lengthy criminal record, the substantial harm he inflicted on the 16-year-old victim due to the beating, and his

23

failure to seek medical treatment for her. Consecutive sentences were clearly appropriate. We cannot hold that the sentences imposed were contrary to law, and we overrule Arnold's fourth assignment of error.

### *V. Ineffective Assistance of Counsel*

{¶83} Finally, in his fifth assignment of error, Arnold argues that he was denied the effective assistance of counsel. He argues that his counsel was ineffective because counsel failed to engage an independent autopsy expert, which he contends was crucial to show that the victim was beaten by a group of girls, and not by Arnold. This assignment of error is not well taken.

{¶84} A court will presume that a properly licensed attorney is competent, and the defendant bears the burden to show ineffective assistance of counsel. *State v. Hamblin*, 37 Ohio St.3d 153, 155-156, 524 N.E.2d 476 (1988); *Hackney*, 1st Dist. Hamilton No. C-150375, 2016-Ohio-4609, at ¶ 36. To sustain a claim for ineffective assistance of counsel, the defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hackney* at ¶ 36.

{¶85} Generally, the decision not to call an expert witness does not constitute ineffective assistance of counsel because that decision is solely a matter of trial strategy. *State v. Coleman*, 45 Ohio St.3d 298, 307-308, 544 N.E.2d 622 (1989); *State v. Durgan*, 1st Dist. Hamilton No. C-170148, 2018-Ohio-2310, ¶ 43. Further, any testimony that the expert would have provided was purely speculative. Arnold cannot demonstrate that the outcome of the proceeding would have been different but for counsel's failure to hire an expert. *See State v. Pennington*, 1st Dist. Hamilton Nos. C-170199 and C-170200, 2018-Ohio-3640, ¶ 38; *State v. McHenry*,

1st Dist. Hamilton No. C-170671, 2018-Ohio-3383, ¶ 25. Therefore, Arnold has failed to meet his burden to show ineffective assistance of counsel. *See Strickland* at 687-689; *Hackney* at ¶ 37-38. We overrule Arnold's fifth assignment of error.

### *VI. Summary*

{¶86} In sum, we hold that (1) Arnold's convictions for felonious assault, abduction, and tampering with evidence were supported by sufficient evidence; (2) those convictions were not against the manifest weight of the evidence; (3) the trial court did not err in failing to merge the reckless-homicide and abduction counts for sentencing; (4) the trial court did not err in imposing consecutive sentences; and (5) Arnold failed to meet his burden to show ineffective assistance of counsel. Consequently, we overrule his five assignment of error and affirm the trial court's judgment.

Judgment affirmed.

**MOCK, P.J.,** and **MYERS, J.,** concur.

Please note:

The court has recorded its own entry this date.